Taylor Rose Thompson, Esq.
AK Bar. No. 1711071
**North Slope Borough**
Department of Law
P.O. Box 69
Utqiagvik, AK 99723
Tel.: 907.852.0300
Email: taylor.thompson@north-slope.org

*Counsel for North Slope Borough*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTH SLOPE BOROUGH,<br><br>Plaintiff,<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT; UNITED STATES DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior; and STEVE COHN, in his official capacity as Director of the Bureau of Land Management Alaska Office,<br><br>Defendants. | Civil Action No. _____ |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

(Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501–6508;
Administrative Procedure Act, 5 U.S.C. §§ 702–706;
Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101 *et seq.*;
National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h;
Regulatory Flexibility Act, 5 U.S.C. §§ 601-612;
Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.*)

Plaintiff North Slope Borough ("Borough") by and through undersigned counsel,

alleges and pleads as follows:

Complaint – 1
*North Slope Borough v. Haaland et al.*, No. _____

# INTRODUCTION

1.      The Borough is the area-wide local government representing the residents living on the North Slope of Alaska and in the National Petroleum Reserve Alaska ("NPR-A" or "Petroleum Reserve").  Borough residents are predominantly Native Alaskan Iñupiat people who have subsisted on the resources of the NPR-A for thousands of years.  Today, the people of the North Slope depend on a mixed economy comprised of subsistence activities and limited employment opportunities supported largely by responsible natural resource development and taxes levied on oil and gas infrastructure, including the infrastructure built in the NPR-A.  Such environmentally responsible development provides an essential source of economic support for the Borough and its villages, allows for continued investments in necessary civil infrastructure, and provides access to vital subsistence resources.

2.      In the past 40 years, the life expectancy of persons living in the Borough has increased substantially, at least in part due to a strong and robust local economy.[1] Approximately 92% of the Borough's budget hails from oil and gas property taxes, assessed on certain infrastructure located within the boundaries of the Borough.  *See* AS 43.56.010(b); AS 29.45.080(a); NSB Ordinance § 3.27.050(A).  The taxes generated fund services for the residents living within the Borough, including roads, schools, wildlife studies, clean drinking water, and flushing toilets. The taxes also provide good-paying jobs

---

[1] Dwyer-Lindgren L, Bertozzi-Villa A, Stubbs RW, et al., *Inequalities in Life Expectancy Among US Counties, 1980 to 2014: Temporal Trends and Key Drivers*. JAMA Intern. Med. 1003 (2017) ( Available at: https://jamanetwork.com /journals/jamainternalmedicine/article-abstract/2626194?cmp=1&appId=scweb).

Complaint – 2
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 2 of 40

within the community that help offset the high cost of living. This encourages residents not to move away from their traditional lands. Without continuing oil and gas development, in a manner that is balanced with the cultural and environmental needs of the people who live in the region, the way of life for indigenous persons of the Arctic will certainly disappear.

3.     The Borough challenges the Bureau of Land Management's ("BLM") Final Rule governing the management of surface resources and Special Areas in the NPR-A. *Management and Protection of the National Petroleum Reserve in Alaska*, 89 Fed. Reg. 38,712 (May 7, 2024) (hereinafter "Final Rule"). The Final Rule is problematic in conception, implementation, and effect. BLM failed to adequately communicate with the Borough. BLM exceeded its regulatory authority under Congress' plain mandate. BLM's analysis used to support the Final Rule is inadequate. BLM failed to consider or even acknowledge the devastating effect the Final Rule will have on the Americans who live in the Arctic communities.

4.     BLM has reversed its previous management decisions without adequate reason or explanation. BLM's Final Rule violates the Naval Petroleum Reserves Production Act ("NPRPA"), Administrative Procedure Act ("APA"), National Environmental Policy Act ("NEPA"), Alaska National Interest Lands Conservation Act ("ANILCA"), the Regulatory Flexibility Act, ("RFA"), Federal Land Policy and Management Act ("FLMPA"), and the Alaska Native Claims Settlement Act ("ANCSA").

5.     Plaintiff brings this action to invalidate BLM's unlawful Final Rule and any subsequent agency decisions based on that Final Rule, as it was a rushed, error filled process, that oversteps the congressional authority delegated to BLM.

Complaint – 3
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 3 of 40

6.      The Final Rule is problematic as it ignores the enabling legislation to manage the NPR-A in accordance with the NPRPA and ignores Congress' plain words on how to manage the NPR-A. It also creates additional regulatory barriers regarding the management of Special Areas, that are both contrary to the NPRPA and arbitrary and capricious. BLM has also exceeded its enabling legislation when it created *de facto* wilderness in contravention of the NPRPA, ANILCA, and FLPMA. In promulgating the Final Rule, BLM has not been cooperative, or followed NEPA. BLM did not engage meaningfully with interested parties and did not complete an Environmental Analysis ("EA") or Environmental Impact Statement ("EIS"), which are contrary to NEPA's requirements. Finally, BLM violated the RFA when it failed to complete an economic analysis as to the Borough's economic interest in this Rule change.

7.      Plaintiff seeks vacatur of the Final Rule, and declaratory, and injunctive relief because BLM's Final Rule is arbitrary and capricious, an abuse of discretion, not in accordance with the law, and without adherence to procedure required by law. 5 U.S.C. § 706.

## PARTIES

## PLAINTIFF NORTH SLOPE BOROUGH

8.      The Borough is the area-wide local government for the northern portion of the State of Alaska, and serves as the regional government for eight Alaska Native villages (Anaktuvuk Pass, Atqasuk, Kaktovik, Nuiqsut, Point Hope, Point Lay, Utqiagvik, Wainwright). The Borough's jurisdiction stretches from the United States-Canada border to the western border of Alaska, and its coastline extends across the Beaufort and Chukchi

Complaint – 4
*North Slope Borough v. Haaland et al.*, No. _____

Seas. The Borough's jurisdiction includes the entire NPR-A and the four villages located within the Reserve specifically—Nuiqsut, Atqasuk, Utqiaġvik, and Wainwright.

9. The people of the North Slope area ratified and established the Home Rule Charter of the North Slope Borough of Alaska in 1972 "in order to form an efficient and economical government with just representation, and in order to provide local government responsive to the will of the people, and to the continuing needs of the communities. . . ." North Slope Borough Charter Preamble, 1972. The creation of the Borough was the first time Native Americans had taken control of their destiny through the use of municipal government. It was, and remains, one of the boldest moves ever made by an indigenous people to regain control of their lives and future. Despite this bold move, the Federal Government continues to exert its will over the people who live in this region.

10. The Borough and its residents offer a unique and first-hand perspective on the Petroleum Reserve and its resources. Nearly three-quarters of Borough residents are Native Alaskan Iñupiat. The Iñupiat have strong cultural and subsistence ties to the Petroleum Reserve area, as they have occupied these lands and have depended on the subsistence resources of the Petroleum Reserve's lands and waters for their physical health, cultural well-being, and survival for thousands of years. Over 98% of Iñupiat households utilize subsistence foods, and the social fabric of Borough communities revolves around subsistence traditions.

11. As a Home Rule Borough with authority analogous to, or greater than, that of county governments in other states, the Borough is a political subdivision and municipal

Complaint – 5
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 5 of 40

corporation incorporated under the laws of the State of Alaska with "all legislative powers not prohibited by law or charter."  *See* Alaska Stat. § 29.04.010.

12.     Responsible oil and gas development is essential to the economic survival and public interest of the Borough and its residents.  Resource development is the primary economic generator for the North Slope region.  Among the Borough's Home Rule powers is the statutory authority to tax infrastructure for oil and gas development.  *See* Alaska Stat. §§ 43.56.010(b), 29.45.080(a); NSB Ordinance § 3.27.050(A).  North Slope oil and gas development is by far the most significant source of funding for community services and infrastructure.  The Borough's primary source of revenue is taxes levied on oil and gas infrastructure, such as processing equipment, pipelines, and other facilities.  For example, in 2023, the Borough received approximately $402,319,552 million in oil and gas property taxes, accounting for 90% of the total property taxes collected by the Borough that year.[2] This is a significant source of revenue for the Borough.

13.     At the time the Borough was formed, most Iñupiat people relied entirely on subsistence for their survival.  In the decades since, the Borough and its residents have transitioned to a more contemporary cash-based economy in which jobs, business opportunities, development, and a commercial tax base are necessary.  Like other citizens across the country, Borough residents should have high living standards, access to modern health care, a high-quality education, and opportunities to build a future in the modern

---

[2] NSB Popular Annual Financial Report, pg. 18, last accessed July 4, 2024, available at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.north-slope.org/wp-content/uploads/2024/05/2023-NSB-Popular-Annual-Financial-Report.pdf.

Complaint – 6
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 6 of 40

world.  In the North Slope region, the only resource that can support and sustain these goals is responsible oil and natural gas development and production, because these community services are paid for with tax revenue from the oil and gas industry.  The public benefits of oil and gas development on the North Slope are undeniable—the average life expectancy of a person born in the Borough increased from 65 years in 1980 to 76.2 years in 2022, the greatest increase in the nation.  While Borough residents continue to rely on subsistence resources, and will do so well into the future, they also rely on modern medical facilities, sanitation and water infrastructure, public schools, and other basic necessities enjoyed in communities across the country.

14.     In addition to the tax revenue generated from oil and gas infrastructure, such development separately generates a sincerely huge economic royalty revenue sharing available to fund the NPR-A Impact Grant Program, which administers grants from federal royalties, which are used to offset development impacts or improve communities impacted by development.  Such grants are available to North Slope Borough municipalities, including to the Borough and incorporated cities.  These grants are of significant benefit to the local communities.  For example, since the program started, the Borough has received more than $143 million in NPR-A Impact Grants, which it has used for services including workforce development, comprehensive planning for communities, infrastructure and utilities, and land management and permitting.  Nuiqsut has received nearly $22 million in NPR-A Impact Grants since the inception of the program, which have been used to support general government operations, youth center operations and maintenance, a boat ramp,

Complaint – 7
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 7 of 40

community center maintenance, a natural gas pipeline, building conversions, and the Colville River Access Road.

15.　With respect to management of the NPR-A, the Borough has a significant role in exercising its management and regulatory authority and substantive biological and traditional expertise in a manner that protects its residents' cultural and subsistence resources while promoting and ensuring responsible resource and economic development, as such resource development is vital to the continued ability of allowing its residents to survive and thrive in a modern world while sustaining local Iñupiaq culture, practices, and values.　In this way, the exercise of the Borough's wildlife management authority is consistent with its founding principle that it is the people of the North Slope who should determine what is in their own public interest and how to appropriately balance economic development and subsistence objectives.

16.　Exploration and development activities in the NPR-A also support increased employment opportunities for the residents of the Borough's Native villages.　Currently, economic opportunities in Borough communities are limited due to their isolated locations. Development on the North Slope brings jobs to the Borough's communities, including for Borough residents.　More than one-third of jobs held by Borough residents are directly or indirectly supported by the oil and gas industry.

17.　Historically, BLM has engaged and collaborated with the Borough on issues associated with management of the Petroleum Reserve.　The Borough has been represented in the various Integrated Activity Plan ("IAP") and EIS processes, and is a voting member of the NPR-A Working Group. It has historically been through this collaborative process

Complaint – 8
*North Slope Borough v. Haaland et al.*, No. _____

that BLM has been able to work with its stakeholders prior to a Rule being issued, or finalized.

18.     On September 8, 2024, BLM published a Proposed Rule for the management and protection of the NPR-A.  88 Fed. Reg. 62,025 (Sept. 8, 2024) ("Proposed Rule").  The Borough, in conjunction with the Arctic Slope Regional Corporation and Iñupiat Community of the Arctic Slope, filed a comment letter identifying numerous flaws with the Proposed Rule. On May 7, 2024, BLM published its Final Rule.  This Final Rule was promulgated in violation of federal law and policy.

19.     BLM's implementation of the Final Rule will negatively impact the Borough's responsibilities to provide for the economic, cultural, and social well-being of its residents, as well as its authority over its lands and resources, as it directly cuts off the Borough's ability to tax infrastructure for new oil and gas development and exploration projects.

20.     The Borough has a procedural interest in Defendants' compliance with decision-making processes under the APA and NEPA, and in Defendants' duty to support their decisions. The Borough has standing, as it has an interest in its ability to enforce land-use and health regulations, its powers of revenue collection and taxation, and proprietary interests in the Final Rule.

21.     Such injuries are actual, concrete, and particularized, and they are caused by Defendants' failure to adhere to their mandatory statutory duties under the NPRPA, APA, ANCSA, ANILCA, FLMPA, RFA, and NEPA.

**DEFENDANTS**

Complaint – 9
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 9 of 40

22. Defendant Department of the Interior ("DOI") is an agency for the United States charged with overseeing public lands, including issuing the decisions appealed in this action.

23. Defendant BLM is an agency of the DOI.

24. Defendant Debra Halland is the Secretary of the DOI. She is sued in her official capacity.

25. Defendant Tracy Stone-Manning is the Director of the BLM. She is sued in her official capacity.

26. Defendant Steve Cohn is the Director of the BLM Alaska Office. He is sued in his official capacity.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

28. Defendants' sovereign immunity is waived pursuant to the APA. 5 U.S.C. § 702.

Complaint – 10
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 10 of 40

29.     The Court has jurisdiction over the defendants pursuant to 5 U.S.C. § 702.

30.     This matter is timely pursuant to 28 U.S.C. § 2401 because the first decision being appealed is dated May 7, 2024, and is timely under 42 U.S.C. § 6506a(n)(1) to the extent this provision applies.

31.     Venue is proper in this District because Defendants are federal officers sued in their official capacities and because a substantial part of the events or omissions giving rise to this action occurred within this District. *See* 28 U.S.C. § 1391(e).

32.     An actual controversy presently exists between the parties concerning the validity of the implemented Final Rule Regulations. That controversy is justiciable in character, and speedy relief is needed to preserve plaintiff's rights.

33.     Declaratory judgment is necessary, as it will resolve the controversy between the parties.

## BACKGROUND

### I.     Relevant Statutory Provisions

#### A.     Administrative Procedure Act

34.     The APA provides that persons "adversely affected or aggrieved by agency action" are entitled to judicial review thereof. 5 U.S.C. §§ 702; 704.  The Court has authority to decide all relevant questions of law and to determine the meaning or applicability of the terms of an agency's action.  5 U.S.C. § 706; *see also Loper Bright Enterprises et. al.  v. Raimondo, Secretary of Commerce, et. al.*, 603 US ___,   2024   WL 3208360 (2024).  The Court will hold unlawful and set aside agency actions that are found to be (1) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance

Complaint – 11
*North Slope Borough v. Haaland et al.*, No._____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 11 of 40

with law, 5 U.S.C. § 706(A); (2) in excess of statutory jurisdiction, authority or limitations, or short of statutory right, 5 U.S.C. § 706(C); or (3) without observance of procedure as required by law.  5 U.S.C. § 706(D).

35.     Under the APA, an agency is required to provide interested parties an opportunity to participate in rulemaking. 5 U.S.C. §553(c). The purposes of the APA's notice and comment requirements include:  (1) ensuring that agency regulations are tested via exposure to diverse public comment; (2) ensuring fairness to affected parties; and (3) giving affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.

## B.     National Petroleum Reserves Production Act

36.     The NPRPA governs BLM's management of the Petroleum Reserve. 42 U.S.C. §§ 6501–6508.

37.     In 1923, the United States set aside 23 million acres of the North Slope as the Naval Petroleum Reserve No. 4. Exec. Order No. 3797-A (Feb. 27, 1923). This was one of four naval petroleum reserves created to ensure that, "in time of war, the Navy's ships would have adequate petroleum supplies."  H.R. Rep. No. 94-81, pt. I at 5 (1975). The Secretary of the Navy was authorized by Congress to develop and operate the reserves "in his discretion, directly or by contract, lease or otherwise, and to use, store exchange or sell the oil and gas products thereof … for the benefit of the United States." Pub. L. No. 243, 41 Stat. 812 (1920) (codified as amended at 10 U.S.C. § 8722 (2018).

38.     Alaska became a State in 1959. The Federal government granted the new state an entitlement to 104 million acres of land, 12 million acres of which were located in

Complaint – 12
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 12 of 40

the North Slope Region. In 1968, oil was discovered at Prudhoe Bay on lands that the State of Alaska had already selected. Notably, it was the Alaska Native people who objected to the State's selection, and ultimately the Federal Government's land grab that was to come.

39.     In the 1970's as a response to the oil embargo by the Organization of the Petroleum Exporting Countries, it was clear "that the Nation had a need for oil that exceeded the needs of the Navy." *N. Alaska Envtl. Ctr. v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005). In response to that need, Congress passed the NPRPA.  Pub. L. No. 94-258, 90 Stat. 303 (1976). This re-designated the reserve as the "National Petroleum Reserve in Alaska." The Petroleum Reserve was withdrawn from the operation of the mining and mineral leasing laws and placed under the jurisdiction of the Secretary of the Interior. 42 U.S.C. §§ 6502 & 6503(a). Importantly, the purpose of the NPRPA was redirected to increase the domestic supply of oil and gas, and Congress authorized the Secretary to begin consideration of the "development" that would be "regulated in a manner consistent with the total energy needs of the Nation." H.R. Rep. 94-81(I) at 1 (Mar. 18, 1975).

40.     To emphasize, the primary purpose of the legislation was to promote exploration of the Petroleum Reserve. However, Congress also recognized that in certain areas, "special precautions may be necessary" in order to control activities which would disrupt surface values or disturb fish and wildlife habitat and the subsistence needs of the Alaska Natives. H.R. Conf. Rep. 94-942 at 21 (Mar. 23, 1976). Under Section 6504(a), the NPRPA states that:

[a]ny exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

41.     As Congress explained, "'maximum protection of such surface values' *is not a prohibition* on exploration-related activities within such areas, it is intended that such exploration operations will be conducted in a manner that will *minimize the adverse impact on the environment*." H.R. Conf. Rep. 94-942 at 21 (emphasis added).  For example, Congress noted that this could be achieved by scheduling exploration activities in certain manners or seasons to cause the least adverse influence on fish and wildlife and to minimize adverse effects on Alaska Native subsistence requirements. *Id*.

42.     While Congress recognized that any exploration within Special Areas "shall be conducted in a manner which will assure the maximum protection of such surface values," "maximum protection" is only afforded "*to the extent consistent with the requirements of this Act for the exploration of the reserve*." H.R. Conf. Rep. 94-942 at 21 (emphasis added); 42 U.S.C. § 6504(a) (emphasis added). For example, as this Court recognized, Congress "clearly envisioned" that the Teshekpuk Lake Special Area ("TLSA") would be developed for the production of oil and gas, and that "infrastructure is allowed, and indeed anticipated, within the TLSA." *Sovereign Inupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 769 (D. Ak. 2021).  Thus, protection of designated Special Areas is subservient to Congress' directive to expeditiously explore and develop oil and gas resources.

Complaint – 14
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 14 of 40

43. In 1980, Congress amended the NPRPA through an appropriations bill that authorized development and production in the Petroleum Reserve. Department of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, 2964–65 (1980). Recognizing that "we can no longer delay efforts which would increase the domestic supply of oil and gas," 126 Cong. Rec. 29,489 (1980) (statement of Sen. Stevens), the 1980 amendment mandated "an expeditious program of competitive leasing of oil and gas" in the Petroleum Reserve. 42 U.S.C. § 6506a(a). That legislation "was passed as part of an effort to combat the difficulties caused by the energy crisis." *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 57 (D.D.C. 2009). While focused on promoting the exploration and development of the Petroleum Reserve's oil and gas potential, S. Rep. 96-985 at 34 (Sept. 23, 1980), Congress authorized BLM to mitigate certain adverse impacts associated with expanded activities in the Petroleum Reserve. Specifically, Congress amended the NPRPA to state that:

> [a]ctivities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska.

42 U.S.C. § 6506a(b).

44. Accordingly, the NPRPA's authorization to "include or provide for such conditions, restrictions, and prohibitions" is limited to certain undertaken "activities" and BLM can only mitigate "reasonably foreseeable" and "significantly adverse" effects of those activities on NPR-A surface resources. 42 U.S.C. § 6506a(b).

Complaint – 15
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 15 of 40

45.     BLM is the lead federal agency for leasing, exploration, and development approvals. *See* 43 C.F.R. pts. 3000, 3130, 3150, 3160.   Since taking over management of the Petroleum Reserve, BLM has historically recognized that the NPRPA and its implementing regulations are to "balance energy development with environmental protection and subsistence values." *Proposed Rulemaking Authorizing Oil and Gas Leasing in the National Petroleum Reserve-Alaska*, 46 Fed. Reg. 37,725 (July 22, 1981). The balance has been unilaterally and unlawfully shifted with the implementation of the Final Rule.

46.     The NPRPA excludes the NPR-A from the application of Section 202 of FLPMA, 43 U.S.C. § 1712, which requires BLM to develop land use plans (called "resource management plans"), BLM manages the NPR-A under an Integrated Activity Plan ("IAP").   *See* BLM, *National Petroleum Reserve in Alaska Integrated Activity Plan and Final Environmental Impact Statement* at 1-4 (June 2020) (explaining the statutory framework governing management of the NPR-A).   The IAP process has never been codified in the Federal regulations until this Final Rule, and is seemingly a mechanism to circumvent FLMPA.

47.     Because Congress exempted the Petroleum Reserve from certain requirements of FLPMA, the NPRPA is a dominant-use statute and does not require consideration of FLPMA's sustained yield and multiple use requirements or the preparation of a resource management plan.  Instead, BLM manages the Petroleum Reserve to "strike an appropriate balance" of promoting exploration, development, and production of oil and

Complaint – 16
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 16 of 40

gas while protecting surface resources. To do so, BLM prepares IAPs in conjunction with EISs pursuant to NEPA.

48.    BLM has produced an EIS to support every IAP for the NPR-A through a collaborative process involving cooperating parties, multiple rounds of public and community engagement and feedback, and an outcome that *generally* reflects and respects the views of the people of the North Slope.

### C.    National Environmental Policy Act

49.    NEPA was enacted in 1970 with the ultimate goal of providing procedures that promote and ensure a healthy balance between the well-being of humans and the well-being of the environment. 42 U.S.C. § 4321. This delicate balance is one that the Iñupiat people of the Arctic understand more than anyone.

50.    NEPA requires federal agencies to assess the potential environmental impacts of proposed federal actions prior to making decisions. 42 U.S.C. § 4321 et. seq. This is in recognition of the policy, as enumerated by Congress, that the Federal government is to cooperate with local and State governments in a manner calculated to foster the general welfare, and to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

51.    An agency, "except where compliance would be inconsistent with other statutory requirements," is to include in "every recommendation" on "major Federal actions" that "significantly affect the quality of the human environment," a detailed statement by the responsible official on an enumerated list of environmental effects and a

Complaint – 17
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 17 of 40

reasonable range of alternatives. 42 U.S.C. § 4332. The agency is mandated to complete

an EIS, that contains "a reasonably foreseeable significant effect on the quality of the

human environment." 42 U.S.C. § 4336(b)(1). The agency is similarly required to prepare

an EA with respect to a proposed agency action that either *does not* have a reasonably

foreseeable significant effect on the quality of the human environment, or has an unknown

effect, unless it is excluded pursuant to law. An EA is to be a concise public document that

is prepared by a Federal agency to set for the basis of the finding that there is no significant

impact or determination that an EIS is necessary. 42 U.S.C. § 4336(b)(2).

52.     There are instances where an EIS is not necessary, such as when a regulation

is one "of an administrative, financial, legal, technical, or procedural nature." 43 C.F.R. §

46.210(i). Determining whether the agency's decision not to prepare an EIS was arbitrary

and capricious "requires the Court to determine whether the agency has taken a hard look

at the consequences of its actions, based [its decision] on a consideration of the relevant

factors, and provided a convincing statement of reasons to explain why a project's impacts

are insignificant." *Bair v. Cal. Dep't of Transp.*, 982 F.3d 569, 577-78 (9th Cir. 2020). The

threshold for triggering an environmental analysis under NEPA is "relatively low," but the

obligation applies even if the effects to the environment from the proposed action will be

largely beneficial. *Blue Mountain Biodiversity Proj. v. Blackwood,* 161 F.3d 1208, 1212

(9th Cir. 1998); 40 C.F.R. 1508.1(g)(4).   An agency satisfies NEPA if it applies its

categorical exclusions and determines that neither an EA nor an EIS is required, "so long

as the application of the exclusions to the facts of the particular action is not arbitrary and

Complaint – 18
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 18 of 40

capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456, n.5 (9th Cir. 1996).

53.     Importantly, under NEPA, Congress identified the importance of continued consultation with other Federal and State agencies in this process. 42 U.S.C. § 4334. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The Court has found that consultation has occurred pursuant to NEPA when a draft has been sent in advance of the Rulemaking, and is revised based on comments received, when it met with stakeholders and interested parties over years and numerous times about a specific proposal. *Envtl. Def. Ctr. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 864 (9th Cir. 2003).

54.     There has been no EIS prepared in conjunction with this Final Rule. Nor has there been an EA. Nor has there been meaningful consultation with the Borough.

### D.     Regulatory Flexibility Act

55.     The RFA requires an agency to publish a regulatory flexibility agenda in the Federal Register whenever the agency anticipates their rule will have a "significant economic impact on a substantial number of small entities." 5 U.S.C. §602(a)(1). The RFA requires administrative agencies to consider the effect of their actions on small entities, including small businesses, small non-profit enterprises, and small local governments. 5 U.S.C. §§ 601, *et seq*. "Significant economic impact" and "substantial number" are not defined by the RFA.

56.     "Small entities" are defined by RFA to include governments of cities, towns, and villages, with populations of less than 50,000. 5 U.S.C. §601(6). The population of the

Complaint – 19
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 19 of 40

Borough is well below this threshold. Furthermore, all eight of the permanent Alaska Native villages in the North Slope meet the statutory definition of "small entities" and are absolutely affected by the implementation of this Final Rule. However, BLM concludes in its analysis that only four of these communities – Wainwright, Utqiagvik, Atqasuk, and Nuiqsut – are likely considered small government jurisdictions. This Rule impacts more than four communities, it impacts the area-wide local government as well.

57.    Whenever an agency proposes a rule pursuant to the section 553 of the APA, the RFA requires the agency to prepare an initial regulatory flexibility analysis. 5 U.S.C. § 603(a). Each initial regulatory flexibility analysis shall include, inter alia, a description of the advice and recommendations of representatives of the impacted small entities. 5 U.S.C. § 603(d)((1)(C). This includes the advice and recommendations of said representatives regarding, inter alia, relevant Federal rules which may duplicate, overlap, or conflict with the proposed rule. 5 U.S.C. § 603(b)(5).

58.    Whenever an agency promulgates a final rule pursuant to section 553 of the APA, the RFA requires the agency to prepare a final regulatory flexibility analysis. 5 U.S.C. § 604(a). Each final regulatory flexibility analysis shall include, inter alia, "a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis." 5 U.S.C. § 604(a)(2). The final analysis is also required to include, "a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available." 5 U.S.C. § 604(a)(4).

59.    BLM prepared a cursory "Economic Analysis" to determine "if the effects of the proposed rule meet statutory and regulatory thresholds that would trigger more

Complaint – 20
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 20 of 40

detailed analysis" under EO 12866, as amended by EO 14094, or the RFA. BLM, *Economic Analysis for Proposed Regulation: Management and Protection of the National Petroleum Reserve in Alaska*, at 1 (2023). The BLM estimated that the annual effect on the economy if the regulatory changes would be "less than $200 million" and would "not adversely affect in a material way the economy, a sector of the economy, productivity, or local governments or communities." 89 Fed. Reg. 38,749-52 (May 7, 2024). To understand the economic impact of a Rule to a local government, presumably an analysis on that very relationship would have to be conducted in order to know definitively whether there is an impact.

60.    BLM concluded in their cursory analysis that their rule would not have a significant economic impact on a substantial number of small entities. This conclusion is alarmingly inaccurate. BLM's Final Rule not only affects, but in some instances, prevents oil and gas development in the NPR-A. The Borough's primary source of revenue is taxes levied on oil and gas infrastructure (including in the NPR-A). This revenue empowers the Borough to provide medical services, emergency services, quality education, utilities, employment, and modern opportunities to its residents. Responsible oil and gas development is therefore crucial to the economic well-being of the entire Borough. To conclude that the economic well-being of all the Alaska Native villages in the North Slope is insignificant is not only statutorily incorrect, but disgraceful.

61.    As part of the Notice and Comment period, Commenters "expressed concerns" over the economic analysis, and BLM had no ability to be reflective in their process. *Id*. at 38,749-53 (May 7, 2024). BLM responded that the NPRPA required

Complaint – 21
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 21 of 40

"maximum protection of significant resources values in Special Areas" subject to the NPRPA, and that "[e]conomic impacts are part of NEPA analysis and will be disclosed as part of such analysis." *Id*. at 38,740-41. If no economic analysis is performed on the entities who are affected, and if there is no NEPA analysis, then there is no data in which to reasonably know the consequences of a Rule, which is the point of the RFA.

62.     In granting relief under RFA § 611, a court may order an agency "to take corrective action consistent with" the RFA and APA, which may include remanding the Rule to the agency or finding the Rule invalid. 5 U.S.C. § 611(a)(4)(A).

### E.     Alaska Native Claims Settlement Act

63.     Alaska's lands have historically been subject to competing interests and interested parties. Control was the impetus for statehood, and for forming the Borough. ANCSA was enacted in 1971. 43 U.S.C. §§ 1601 *et seq*. This extinguished Alaska Natives' claims to aboriginal title by conveying more than 44 million acres and $962.5 million to corporate entities that were established by ANCSA. *Sturgeon v. Frost (Sturgeon I)*, 577 U.S. 424 (2016). The public policy and ultimate purpose of the settlement was to "rapidly, with certainty, in conformity with the real economic and social needs" resolve the land claims with Alaska Natives." 43 U.S.C. § 1601(b). The indigenous people were not allowed to select land that the State had already selected or were off limits, thus limiting their ability to select land within their traditional boundaries, impeding their right to self-determination.

64.     ANCSA was enacted to settle Alaska Native land claims "in conformity with the real economic and social needs of Natives" and "with maximum participation by Natives in decisions affecting their rights and property." 43 U.S.C. § 1601(b). Ensuring

Complaint – 22
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 22 of 40

that the Native peoples of Alaska have the right to participate in decision making for their own economic well-being is clearly enshrined by Congress.

### F. Alaska National Interest Lands Conservation Act

65.     ANILCA was passed to resolve continued land use and allocation in Alaska. ANILCA's intent was to "provid[e] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska" *and* "provid[e] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." 16 U.S.C. § 3213.

66.     ANILCA set aside 104 million acres of lands in Alaska for preservation purposes. ANILCA also expanded the NPR-A, but clearly and expressly, did not place any NPR-A lands into conservation system units. 16 U.S.C. § 3102(4). ANILCA, however, also contained a "no more" clause in Section 1326 prohibiting future land withdrawals without Congressional approval. 16 U.S.C. § 3213. This worked to achieve ANCSA's goal of ensuring adequate economic opportunity for the residents of the Arctic.

### G. Federal Land Policy and Management Act

67.     FLPMA generally governs the management of public lands by BLM. The Petroleum Reserve is exempted from several FLMPA requirements: (1) the land use plan requirements and (2) the wilderness studies. 42 U.S.C. § 6506a(c) (exempts lands from the land use plan requirements of 42 U.S.C. § 1712 and the wilderness study requirements of 42 U.S.C. § 1782). These exemptions were made to support the dominant use of the NPRPA – responsible oil and gas development. For example, the wilderness study exemption was made because, "the administrative requirements of these sections inhibit

Complaint – 23
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 23 of 40

expeditious leasing." *See* H. Rep. No. 96-1147 at 33 (1980). However, the Final Rule's process for special area designation and amendment as promulgated by BLM mirrors the language of FLPMA's wilderness study requirements. *Compare* 43 C.F.R. § 2361.30(a)(4)-(b) *with* 43 U.S.C. § 1782(a).

68. For example, under FLPMA, the wilderness characteristics of lands subject to review and designation as wilderness include lands with "recreation and scenic values." 43 U.S.C. § 1782(a) (referencing 43 U.S.C. § 1711(a)). Under the Final Rule, during the process of designating and amending Special Areas, BLM must evaluate lands for the presence of "recreational…or scenic values." 43 C.F.R. § 2361.30(b). In other words, some of the characteristics that make lands eligible for wilderness status under FLPMA, are the same characteristics that make lands eligible as Special Areas under the Final Rule.

69. Wilderness areas under FLPMA are "devoted to the public purposes of recreational, scenic, scientific, educational, conservation and historical use." 16 U.S.C. § 1133(b). For Special Areas under the Final Rule, measures must be adopted to "assure maximum protection of significant resource values." 43 C.F.R. § 2361.30(b)(5). Notably, "significant resource values" includes "subsistence, recreational, fish and wildlife, historical, scenic, or other surface value(s)." 43 C.F.R. § 2361.5. In other words, wilderness areas and Special Areas are both devoted to protecting the same things.

70. The similarities between wilderness areas and special areas are both striking and problematic. To summarize, the Petroleum Reserve is exempt from the wilderness study requirements of FLPMA because those procedural requirements hinder expedient oil and gas leasing within the NPR-A. However, under BLM's Final Rule, the Petroleum

Complaint – 24
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 24 of 40

Reserve is subject to Special Area designations. Special Areas and wilderness areas share defining characteristics. Special Areas and wilderness areas share common purposes. Special Areas and wilderness areas protect the same values. Congress would not have exempted the Petroleum Reserve from wilderness study requirements if Congress wanted the NPR-A to be managed as a wilderness area.

## II.    Factual Background

71.    The NPR-A is not a wilderness area. Specifically set aside as a Petroleum Reserve, although exploration and development increased significantly after 1980, the NPR-A has been the site of oil and gas activities for decades. For example, in addition to the area near Nuiqsut where there is currently significant development, throughout the Reserve, there have been extensive seismic surveys, the drilling of more than 100 exploratory wells, and the construction of infrastructure and facilities to support these drill sites. Near Utqiaġvik, there are three producing natural gas fields with multiple wells, as well as supporting infrastructure, that supply gas to the village for its energy needs. And, of course, the NPR-A area is occupied and used by Borough residents and others; throughout the Petroleum Reserve, there are hundreds of allotments, cabins, hunting and fishing camps, and trails and ice roads for village travel and subsistence hunting.

### A.    Management of the NPR-A

72.    Because the NPRPA excludes the NPR-A from the application of Section 202 of FLPMA, 43 U.S.C. § 1712, which requires BLM to develop land use plans (called "resource management plans" or "RMPs"), BLM manages the NPR-A under an IAP. In 2013, after preparing an EIS pursuant to NEPA, the Secretary of the Interior signed a ROD

Complaint – 25
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 25 of 40

approving the first comprehensive management plan for future management of the NPR-A. This ROD made approximately 11.8 million acres within the NPR-A available for oil and gas leasing, and, among other things, made lands available for application for pipelines and other necessary infrastructure. *See* BLM, *National Petroleum Reserve-Alaska Integrated Activity Plan Record of Decision* at 2 (Feb. 2013) ("2013 IAP ROD"). Though the 2013 IAP provided for subsistence access, it prohibited the bulk of other infrastructure that would promote the connectivity of Borough communities and residents.[3]

73. The development of these IAPs/EISs has typically been a collaborative process involving cooperating parties, multiple rounds of public and community engagement and feedback, and an outcome that generally reflects and respects the views of the people of the North Slope. For example, the Borough supported the 2013 IAP ROD that made 11.8 million acres of the Petroleum Reserve available for oil and gas leasing, subject to numerous lease stipulations and best management practices imposing requirements on lessees when constructing facilities and conducting oil and gas operations. BLM, *National Petroleum Reserve-Alaska Integrated Activity Plan Record of Decision* (Feb. 21, 2013).

74. On May 31, 2017, the Secretary of the Interior issued Secretarial Order 3352, directing the Assistant Secretary for Land and Minerals Management to submit "a schedule to effectuate the lawful review and development of a revised Integrated Activity Plan for

---

[4] Press Release, BLM "*Biden-Harris Administration takes critical action to protect Alaska Native subsistence, lands and wildlife*" last accessed July 1, 2024 at https://www.blm.gov/press-release/biden-harris-administration-takes-critical-action-protect-alaska-native-subsistence.

the NPR-A that strikes an appropriate statutory balance of promoting development while protecting surface resources." Secretarial Order 3352, § 4(a)(1)(2) (May 31, 2017). Additionally, in November 2018, the Borough and the State of Alaska formally requested that DOI reconsider the management approach set forth in the 2013 IAP in order to account for advancements in resource development technologies and to reevaluate the IAP's limitations on infrastructure that would benefit local communities through increased connectivity. Letter from State of Alaska and Borough to Asst. Secretary Joseph Balash (Nov. 2, 2018).

75. Pursuant to Secretarial Order 3352, and in part due to the request from the Borough and the State of Alaska, in November 2018, the BLM initiated the process to develop an EIS evaluating a new IAP to determine the appropriate management of BLM-managed lands within the NPR-A. *See* BLM, *National Petroleum Reserve in Alaska Integrated Activity Plan Record of Decision* at 10 (Dec. 2020) ("2020 IAP ROD"). BLM undertook a comprehensive environmental review to inform its decisions and to meet its obligations under NEPA and other federal statutes. This extensive process included scoping, development of Draft and Final EISs, multiple public meetings in North Slope communities, consideration of more than 138,000 public comments, outreach and visits to a number of Alaska communities, including the Borough communities of Anaktuvuk Pass, Atqasuk, Nuiqsut, Point Lay, Utqiaġvik, and Wainwright. *Id.* at 1.

76. The Borough participated as a cooperating agency in the development of the 2020 EIS. This included participating in scoping and coordination meetings, submitting written scoping comments, providing comments on the draft IAP/EIS, which included

Complaint – 27
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 27 of 40

suggestions for modifications and mitigation measures, and reviewing administrative drafts of the Draft and Final EISs.

77. Following the completion of this review process, the Secretary of the Interior signed and published the 2020 IAP ROD on December 31, 2020, approving the IAP and determining where and under what conditions oil and gas leasing will occur in the NPR-A. This revised 2020 IAP ROD superseded the 2013 IAP ROD and opened an additional 6.8 million acres in the Petroleum Reserve to oil and gas leasing subject to revised lease stipulations and required operating procedures.

78. Following a change in administration, and subsequent review of policy decisions, BLM determined that the NEPA analysis completed in 2020 was adequate and remained valid. BLM, *Determination of NEPA Adequacy, National Petroleum Reserve in Alaska Integrated Activity Plan 2020 Final Environmental Impact Statement Evaluation* (Apr. 25, 2022). Notwithstanding the validity of this NEPA analysis, BLM reversed course and issued a ROD reverting management of the Petroleum Reserve back to the requirements from 2013. BLM, *National Petroleum Reserve in Alaska Integrated Activity Plan Record of Decision* (Apr. 2022).

79. Notwithstanding that the Borough has been integrally and historically involved in prior management decisions for the Petroleum Reserve—including as a cooperating agency and as a participant in the NPR-A working group—BLM did not consult with and conducted no outreach to and made no effort to collaborate with the Borough regarding the necessity, merits, or substance of this Final Rule.

C.     BLM's Proposed Rule

Complaint – 28
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 28 of 40

80.     On September 8, 2023, BLM issued its Proposed Rule. 88 Fed. Reg. 62,025 (Sept. 8, 2023). There were a number of issues with the timing, economic analysis, environmental analysis, statutory authority, and communication about the Proposed Rule.

81.     For example, on or about June 12, 2023, the subsea fiber optic network connecting the North Slope of Alaska to both internet and cell phone service was severed. This created a lack of accessibility to the internet and cell phone service until it was repaired on or about September 19, 2023. This was eleven days after BLM issued the Proposed Rule for the NPR-A.

82.     North Slope officials and both Senators Murkowski and Sullivan hosted a press conference to publicly share concerns with the media on the lack of meaningful engagement by the Administration on the Proposed Rule, emphasizing Secretary Haaland's refusal to hear the unified voice of the North Slope Iñupiat.  That same day Representative Peltola introduced H.R. 6285 Alaska's Right to Produce Act of 2023, which would reverse the Proposed Rule and, the next day, Senators Murkowski and Sullivan introduced the Senate Companion S. 3289.  It was only after the above events that DOI staff told various North Slope officials that DOI was considering another short-term extension.

83.     The comment period was originally set to expire on or about November 7, 2023. 88 Fed. Reg. 62,025 (September 8, 2023). The first deadline was extended 10 days, and then another 20 days, due to significant pressure from stakeholders. 88 Fed. Reg. 72,985 (Oct. 24, 2023); 88 Fed. Reg. 80,237 (Nov. 17, 2023).

Complaint – 29
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 29 of 40

84.     Other than ill-fated attempts to schedule public hearings in the Borough's communities during the height of fall subsistence whaling season, there was no meaningful engagement with the local people who would be directly impacted by this Proposed Rule.

85.     The Borough—together with the Iñupiat Community of the Arctic Slope (the regional tribal government for the North Slope) and Arctic Slope Regional Corporation (the Alaska Native Regional Corporation established pursuant to the Alaska Native Claims Settlement Act for the North Slope region)—filed comprehensive public comments in opposition to the Proposed Rule on December 7, 2023.

### D.     BLM's Final Rule

86.     Final NPR-A Rule was announced by press release on April 19, 2024.[4] On May 7, 2024, BLM published its Final Rule in the Federal Register.

87.     The Final Rule and Proposed Rule are largely the same, indicating that despite public comment, BLM pressed forward with their agenda in stark opposition to the will of the people who live in the Arctic.

88.     With no changed circumstances in the region other than the political leadership in Washington, D.C., it is clear the Final Rule serves little purpose other than to undermine Congress' directive that BLM "conduct an expeditious program of competitive leasing of oil and gas" in the Petroleum Reserve, and to withhold the benefits of that program from the North Slope Iñupiat whose livelihoods depend on responsible resource

---

[4] Press Release, BLM "*Biden-Harris Administration takes critical action to protect Alaska Native subsistence, lands and wildlife*" last accessed July 1, 2024 at https://www.blm.gov/press-release/biden-harris-administration-takes-critical-action-protect-alaska-native-subsistence.

Complaint – 30
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 30 of 40

development. The Final Rule, and the process by which it was created, demonstrates that BLM fails to understand the complex but critically important role that oil and gas plays in advancing the interests of the people of the North Slope. BLM is failing to fulfill its broader duties to Congress and to the indigenous people of the North Slope by capitulating to a political agenda that calls for ending domestic oil and gas development with no regard to the economic and national security consequences of those actions.

89.    Instead of promoting "an expeditious program of competitive leasing of oil and gas," the Final Rule significantly distorts the balance that Congress intended and directed through the NPRPA by suggesting measures that would contradict and frustrate this explicit congressional mandate. 42 U.S.C. § 6506a(a).

90.    The Final Rule adds a new definition of "significant resource value," and BLM defines the phrase to mean "any subsistence, recreational, fish and wildlife, historical, or scenic value identified by the Bureau as supporting the designation of a Special Area." 42 U.S.C. § 6506a(a). This definition improperly omits the statutory requirement that such values must be "significant" in order to justify a Special Area designation.

91.    The Final Rule establishes "new standards and procedures for managing and protecting surface resources in the [Petroleum Reserve] from the reasonably foreseeable and significantly adverse effects of oil and gas activities." 88 Fed. Reg. at 62,032. These regulations violate the NPRPA's plain language.

92.    The Final Rule unidirectionally requires the expansion and enhanced protection of Special Areas. 43 C.F.R. § 2361.30(a). The legal implications and

Complaint – 31
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 31 of 40

ramifications of this framework are patently obvious—any member of the public could suggest any area within the Petroleum Reserve as a Special Area and BLM could then impose maximum protective measures while it deliberates for an unspecified time on the merits of that recommendation. This approach is plainly contrary to the requirements and intent of the NPRPA as well as ANILCA. The Final Rule's designation and amendment of Special Areas are impermissibly skewed in a unidirectional manner that also inappropriately excludes the input, knowledge, and perspective of the people who reside both on the North Slope and within the Petroleum Reserve. BLM provides no authority and no explanation for this disparate treatment or the disparate proposed procedural requirements. It is blatantly arbitrary and capricious for BLM to impose anything but the same procedural obligations and considerations to any decisions regarding Special Areas and the protections imposed therein.

93. For the Final Rule, instead of preparing an EA or EIS pursuant to NEPA, BLM relied on a Departmental categorical exclusion that applies to "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature." 88 Fed. Reg. at 62,038; 43 C.F.R. § 46.210(i). BLM's invocation of this categorical exclusion was in error, as the Final Rule will clearly have a significant effect on the environment. Furthermore, BLM erred in determining that none of the extraordinary circumstances listed in 43 C.F.R. § 46.215 were applicable.

94. Additionally, the Final Rule violates the plain language of Congress in the NPRPA, and BLM's interpretation are afforded no deference in this instance. *Loper Bright Enterprises v. Raimondo*, 603 US __, 2024 WL 3208360, at *12 (U.S. June 28, 2024).

Complaint – 32
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 32 of 40

Similarly, the Final Rule violates the Major Questions Doctrine as it concerns an issue of "vast economic and political significance" and Congress has not empowered BLM to take the promulgated actions. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

## FIRST CLAIM FOR RELIEF

**BLM violated NEPA requirements, which include a failure to communicate and coordinate with NSB**

95.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint above as if specifically alleged or pleaded herein.

96.     Defendants' action in failing to consult with the Borough was arbitrary and capricious, was an abuse of discretion, or was not in accordance with the law, or failed to comply with their statutory duty in NEPA by failing to coordinate or even communicate with the Borough in any official capacity regarding the Proposed and/or Final Rule, Defendants' disregarded the Borough's long-standing role in developing appropriate management measures for the Petroleum Reserve.

97.     Indeed, as BLM is well aware, the Borough has been a cooperating agency in many of the prior IAPs/EISs for the Petroleum Reserve.  Neglecting to conduct any sort of outreach to the Borough, as the impacted local government with special expertise, ignores the Borough's prior role as a cooperating agency under NEPA, its specialized expertise in wildlife and natural resources management, and its role as a representative for the people of the North Slope who will be affected by this decision.

98.     The APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary and capricious, an abuse of discretion, not in

Complaint – 33
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 33 of 40

accordance with law," or "without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (D). For each of the above reasons, and others, BLM's adoption of an inadequate Final Rule that fundamentally changes how the NPR-A is managed without consultation with stakeholders or an EA or EIS is arbitrary, capricious, and not in accordance with law as required by NEPA and its implementing regulations, and is subject to judicial review under the APA.

99.     Upon review, the Court should find that BLM violated NEPA's requirements and vacate the Final Rule..

**SECOND CLAIM FOR RELIEF**

**BLM violated NEPA requirements when they failed to complete an EA or EIS, as required under NEPA**

100.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint above as if specifically alleged or pleaded herein.

101.     NEPA requires all federal agencies to prepare an EA, and an EIS for all major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(C). BLM violated NEPA when it failed to prepare an EIS or an EA when enacting the Final Rule.

102.     Instead of preparing an EA or EIS pursuant to NEPA, BLM relied on a Departmental categorical exclusion that applies to "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature." 88 Fed. Reg. at 62,038; 43 C.F.R. § 46.210(i). BLM's invocation of this categorical exclusion was in error, as the Final Rule is clearly intended to have a significant effect on

Complaint – 34
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 34 of 40

the environment. Furthermore, BLM erred in determining that none of the extraordinary circumstances listed in 43 C.F.R. § 46.215 were applicable.

103.    In challenging an agency decision not to prepare an EIS, Plaintiff need not prove that significant environmental effects will occur; it need only raise a "substantial question" that they might. *E.g.*, *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022).

104.    Pursuant to NEPA, Defendants must take a "hard look" at the consequences, environmental impacts, and adverse effects of the proposed actions. 42 U.S.C. § 4332(2)(C). Defendants have failed to abide by this overarching requirement in numerous respects, especially given they did not complete an EA or EIS. It is patently obvious that the Final Rule will have an impact on the environment, and for that very reason, an EA or EIS is necessary.

105.    APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that "are therefore arbitrary and capricious, an abuse of discretion, not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). For each of the above reasons, and others, BLM's adoption of the Final Rule without first preparing an EA or EIS is arbitrary, capricious, and not in accordance with law as required by NEPA and its implementing regulations, and is subject to judicial review under the APA.

106.    Upon review, the Court should find that BLM violated NEPA's requirements and vacate the Final Rule.

Complaint – 35
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 35 of 40

# THIRD CLAIM FOR RELIEF

**BLM violated FLPMA, ANILCA, and the NPRPA by exceeding its statutory authority in promulgating the Final Rule.**

107.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint above as if specifically alleged or pleaded herein.

108.    The NPR-A is explicitly exempted from FLPMA wilderness requirements, and yet, Defendants have implemented in the Final Rule, the measures that effectively create wilderness areas and wilderness study areas in excess of its statutory jurisdiction under NPRPA and ANILCA.

109.    The Final Rule contravenes the NPRPA and congressional intent. BLM exceeded its statutory authority with respect to the Management of Special Areas.[5]  As previously outlined, the NPRPA's direction as to any exploration as to Special Areas is to be balanced to assure maximum protection of the surface values of the land, to the extent consistent with the requirements of the NPRPA for exploration. Joint Statement of the Committee of Conference, S. Rep. No. 94-708 at 21 (Mar. 23, 1976) (emphasis added); 42 U.S.C. § 6504(a). However, BLM's regulation in § 2361.4 allows BLM to presume that exploration or development "should not be permitted" unless "specific information available to the Bureau clearly demonstrates that those activities can be conducted with <u>no</u>

---

[5] Particular Regulations that violate the Special Areas Management contrary to Congress' plain language: § 2361.4 (Responsibility); § 2361.5 (Definitions); § 2361.6 (Effect of Law), § 2361.10 (Protection of Surface Resources);  § 2361.20 (Existing Special Areas); § 2361.30 (Special Areas designation and amendment Process; § 2361.40 (Management of oil and gas activities in Special Areas); § 2361.50 ( Management of subsistence uses within Special Areas; § 2361.60 (Co-stewardship opportunities in management of Special Areas and Subsistence); § 2361.70 (Use authorizations).

Complaint – 36
*North Slope Borough v. Haaland et al.*, No._____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 36 of 40

or minimal adverse effects on significant resource values." 43 C.F.R. § 2361.4. This is contrary to the plain language of Congress in the NPRPA, which clearly envisioned that Special areas would still be open for development. Instead, for Special Areas, BLM states that "steps to minimize adverse impacts on existing resource values will be required and implemented."

110. ANILCA has made clear that there are to be no additional Conservation System Units in Alaska that are over 5,000 acres. By de facto locking up 13 million acres of Special Areas as wilderness, BLM is end-running ANILCA's no more clause.

111. BLM's Final Rule exceeds its statutory authority with respect to the management of surface resources. The NPRPA only allows BLM to "mitigate" certain adverse effects on the surface resources of the Petroleum Reserve. 42 U.S.C. § 6506a(b). The Final Rule establishes new standards and procedures for managing and protecting surface resources in the NPR-A, which is not consistent with congressional intent.

112. There is no statutory authority for BLM to have implemented the requirement to include an IAP. BLM including an IAP requirement in the Final Rule is a clear departure from Congress' intent and plain language in the NPRPA when they excluded this area from FLPMA.

113. APA requires that courts "hold unlawful and set aside agency action, findings, and conclusions" that are therefore arbitrary and capricious, an abuse of discretion, not in accordance with law;" "in excess of statutory jurisdiction, authority or limitations, or short of statutory right; "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). For each of the above reasons, and others, BLM's adoption

Complaint – 37
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 37 of 40

of the Final Rule is arbitrary, capricious, and not in accordance with law as required by its implementing regulations, and exceeds its statutory jurisdiction and authority, and is subject to judicial review under the APA.

114.    Upon review, the Court should find that Defendants have exceeded their enabling legislation from Congress in the NPRPA by creating *de facto* wilderness areas in "Special Areas" through the Final Rule. The Court should similarly find that the Defendants have exceeded their enabling legislation in ANILCA when they promulgated the "Special Area" definition in the Final Rule, as it is a de facto conservation area. The Court should find that BLM exceeded their enabling legislation when they created new standards in respect to the management of surface resources.

115.    The Court should find that BLM has exceeded its enabling legislation when they implemented this Final Rule, and vacate the Final Rule.

### FOURTH CLAIM FOR RELIEF

**BLM violated the Regulatory Flexibility Act when it did not conduct an economic analysis that took into consideration the Borough's economic impact and the implementation of the Final Rule.**

116.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint above as if specifically alleged or pleaded herein.

117.    Congress enacted the Regulatory Flexibility Act, which required Defendants to prepare an initial regulatory flexibility analysis, as this Final Rule impacts a substantial number of small entities. While Defendants completed a short Economic Analysis, it was erroneous as it failed to consider the Borough and its communities as small entities in analyzing the Rule's economic impacts. As outlined above, the Final Rule has a significant

Complaint – 38
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 38 of 40

economic impact on the Borough and its communities, and it was erroneous to not include or evaluate these impacts in the economic analysis.

118.    By using a definition other than that of the SBA, the BLM violated the procedure of law as mandated by statute.

119.    Upon review, the Court should find that the Defendants failure to consider the economic impacts this Final Rule would have on the Borough and its communities, and only considering its impact on oil companies, was arbitrary and capricious, and therefore violative of the RFA.

120.    As such, the Court should vacate and remand the Final Rule for Defendants to conduct an economic analysis that considers the economic impacts to the Borough and its communities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Declare that Defendants have violated the ANILCA, NEPA, FLPMA, RFA, NPRPA, and APA and further declare that the actions set forth above are arbitrary and capricious, not in accordance with law and procedure as required by law; and/or in excess of their enabling legislation, authority or limitations.

B.    Vacate all of Defendants' Final Rule and any actions taken by Defendants in reliance on the Final Rule;

C.    Impose injunctive relief, including enjoining the Defendants from allowing, authorizing, or approving any action in reliance on the Final Rule and requiring the Defendants to complete an economic analysis consistent with the requirements of the RFA;

Complaint – 39
*North Slope Borough v. Haaland et al.*, No. _____

D.    Grant any such other relief as the Court considers just and proper, including

Plaintiff's costs of bringing this action and reasonable attorneys' fees.

Dated this 5<u>th</u> day of July, 2024.

s/Taylor Rose Thompson

NORTH SLOPE BOROUGH
Taylor Rose Thompson, Esq, AK Bar No. 1711071
P.O. Box 69
Utqiagvik, AK 99723
Tel.: 907.852.0300
Email: Taylor.thompson@north-slope.org

*Counsel for North Slope Borough*

Complaint – 40
*North Slope Borough v. Haaland et al.*, No. _____
Case 3:24-cv-00145-HRH   Document 1   Filed 07/05/24   Page 40 of 40